**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-182 (BAH)** |
| **v.** | : | |
| | : | |
| **CHAD CLIFTON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Chad Clifton to 21 days incarceration, to be served intermittently in 2 installments, as a condition of and within the first 12 months of a 36 month term of probation, pursuant to 18 U.S.C. § 3562(b)(10), and $500 in restitution.

I.      **Introduction**

Defendant Chad Clifton, a 47-year construction contractor and South Carolina resident, and his co-defendant, David Johnston,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.

---

[1] On December 16, 2022, this Court sentenced David Johnston, who, like Clifton, pleaded guilty to a single count of violating 40 U.S.C. § 5104(e)(2)(G), to 21 days of intermittent incarceration as a requirement of 36 months of probation, 90 days of home detention, a $2,500 fine, and $500 in restitution.

Clifton pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 21 days incarceration and probation is appropriate in this case because Clifton (1) made his way to the forefront of the mob of rioters and, while there, witnessed and recorded violent clashes between rioters and police officers, including rioters throwing objects, spraying chemical irritants, and initiating physical altercations with police officers; (2) boastfully exclaimed – after making it past the violent altercations – that he "broke[] past the barrier . . . [and] the policemen have been overwhelmed!"; (3) entered the Capitol building about seven minutes after it had been breached by force, while others around him climbed through broken windows and over broken glass and while alarms sounded; (4) spent 30 minutes inside the Capitol building making his way through several areas, including the Crypt where rioters had just overwhelmed a line of officers; (5) watched as rioters obstructed and prevented sliding bay doors from closing and then proceeded through those same doors towards the Visitor's Center; (6) witnessed a confrontation between rioters and police officers in the Visitor's Center, yet failed to leave the area (or building) until officers corralled him out; (7) made numerous violent and threatening statements before and after January 6 in social media posts and messages; and (8) took a hit of a marijuana joint while inside the Capitol building.

## II.    Factual And Procedural Background

### The January 6, 2021 Attack On The Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 26 (Statement of Offense), at 1-4; ECF No. 1-1 (Statement of Facts).

*Chad Clifton's Pre-January 6 Social Media Statements*

As early as November 2020, Clifton was conversing about the validity of the presidential election. For example, he followed and shared TikTok posts referencing alleged fraud in the election:



In December 2020, Clifton began expressing violent rhetoric about the presidential election. For example, Clifton wrote a message on TikTok, assuring that people would die if they came between him and what he loved, including his president:

> I always say shoot to kill do not waste your bullets! I pray what you're saying is true and that the inevitable never happens! I promise you this you will find me in a pool spent brass not a puddle of piss! I love America I love my president I love my family and I love what we have and anyone come between me and that I can assure you will die. America for life! US<3USTrump2016-2028US<3

Clifton's wife tried to convince Clifton to retreat from draws of social media regarding the recent election. She told, him, for example, that "I really feel like I'm loosing [sic] you to some black hole that your not going to come out of" and "you have got to stop watching and believing [sic] all this shit you keep watching on TikTok." Instead, Clifton decided to travel to Washington, D.C. on January 6. As he explained to a friend, "There's going to be a whole bunch of shit change and hopefully in the next couple of days stop the steel that's what I'm [g]oing for!"

*Chad Clifton's Role In The January 6, 2021 Attack On The Capitol*

On January 5, 2021, Chad Clifton and David Johnston traveled from their homes in South Carolina to Washington, D.C. to attend the "Stop the Steal" rally. Clifton and Johnston arrived in Washington, D.C. early in the morning on January 6, 2021, before the speeches at the Ellipse had started. The two made their way to the Capitol grounds. Clifton's co-defendant, David Johnston, posed for a picture in front of the Capitol building, which was clearly surrounded by a continuous barrier of bike racks.



After watching the former President's speech, Clifton and Johnston joined the crowd making their way toward the Capitol building. Clifton recorded the walk and narrated statements like, "Look at where we are, look at where we are going," and "exciting times are coming!" Clifton occasionally turned the camera to show himself, and he could be seen wearing a red baseball cap with "Trump 2020 – Keep America Great," a grey and black face covering (at times), black rimmed glasses, a green hooded sweatshirt, a grey/silver jacket, and a yellow backpack with black shoulder straps.



Clifton and Johnston made it back to the same area where they visited earlier in the day. This time, though, Clifton took photos of the bike rack barriers pushed out of the way and the snow fencing sprawled on the ground.

 

Clifton moved past the dissembled bike rack barriers and torn down snow fencing and approached the crowd that was moving increasingly closer to the Capitol building. As Clifton and Johnston worked their way to nearly the front of the crowd of thousands of rioters, it became apparent that only a line of police officers and a wall of bike racks stood between the crowd and the Capitol building. The photos below show Clifton's vantage point and his proximity to the front of the crowd – he was only a few people behind the line of officers and bike rack wall.

 

At the front of the crowd where Clifton and Johnston stood, violence intensified. Rioters threw objects at police officers from the crowd, including, according to Clifton, batteries; numerous flash bang grenades exploded; rioters sprayed chemical irritant at police officers; and violent confrontations ensued as rioters attempted to break through the bike rack barriers. Clifton sent a text to a family member confirming the obvious: "It's insane now."

Near Clifton and Johnston, police deployed the Long Range Acoustic Device or LRAD, which consists of deafening sirens followed by audible warnings, such as "This is the Metropolitan Police Department. This area is now a restricted access area. . . . All people must leave the area immediately." Rather than comply with the orders, Clifton remained at the forefront of the riotous crowd, recording the mayhem.

Clifton eventually ascended the steps of the building and recorded a video in which he exclaimed, "we've broken past the barrier! . . . The policemen have been overwhelmed!" His co-defendant, Johnston, simultaneously exclaimed, "we've broken past the barrier, we've reached the doors of the Capitol!" Right before Clifton entered the building, one rioter can be heard on Clifton's video recording making a reference to "lethal rounds." Clifton replied, "what'd you say – don't go in there?" The other rioter respondent, "I said if you go in there, they can use lethal rounds, they have legal right to. They can use lethal rounds." Someone answered, "they can shoot to kill." Someone else responded, "fuck yeah they will." Clifton went inside anyway.

Clifton entered the Senate Wing Door just seven minutes after it had been breached; alarms loudly rang, broken glass littered the floor, and rioters climbed through windows and yelled things like, "I just stormed the fucking Capitol!"



Clifton lingered near the entryway while Johnston made his way inside the building. Once reunited inside the building, the pair walked toward the Crypt. Clifton recorded on his phone as they walked through the Capitol building. In the video, rioters can be heard loudly chanting "USA USA USA" while sirens blared loudly in the background.

Once inside the Crypt, Clifton quickly joined a mass of rioters that greatly outnumbered police officers and had just broken the police line. Rioters were screaming, whistling, and chanting "Stop The Steal." Clifton recorded himself and Johnston inside the Crypt with a police officer nearby, and posted the video on TikTok with the caption: "Storming the capital building everybody's going to come way more in DC today first hand I was there."



Clifton and Johnston remained in the mayhem in the Crypt area for about five minutes. Then, with police officers pushed aside, rioters, Clifton included, continued to trek deeper into the Capitol building into the Crypt Lobby. As Clifton walked into the Crypt Lobby, there were two plainly visible rolling bay doors starting to close, but rioters barricaded chairs and their bodies underneath the doors, and the safety mechanism stopped the doors from closing.



The obstructed rolling bay doors were yet another clear sign that rioters should not have progressed farther into the Capitol building, but it was no deterrent to Clifton. In fact, as a second rolling bay door began to close, Clifton moved closer and watched and video recorded or took

pictures of his fellow rioters preventing it from fully closing so rioters could continue to breach the building.



Clifton and Johnston then turned around and walked back into the Crypt. While there, they took several pictures or videos on their cell phones. As Clifton and Johnston made their way around the Crypt, other rioters exited the Crypt through the same path from which Clifton had originally entered. Rather than follow them out of the building, Clifton and Johnston continued to make their way throughout the Crypt taking pictures.

 

Clifton and Johnston then went back into the Crypt lobby and walked through the doorway where Clifton watched rioters obstruct the rolling bay doors and took the stairs down to the Visitor's Center. While there, Clifton took pictures and videos and then watched police subdue a rioter. Rather than leave, Clifton inched closer to the commotion.



Clifton and Johnston remained in the Visitor's Center – primarily filming interactions between officers and riots – until officers corralled them out. The pair were two of the last rioters escorted out of the area.



With officers behind them this time, Clifton and Johnston – for the third time – made their way through the Crypt Lobby and into the Crypt.



Clifton and Johnston walked back to the Senate Wing Doors where they had originally entered the building. The corridor was full of rioters who had freshly gained access to the building. In the corridor, Clifton noticed other rioters smoking marijuana. While recording on his cell phone Clifton said, "fuck it – while you're hitting it, let me hit it one time." He then took a marijuana joint from a fellow rioter and said, "I don't give a fuck. We in Washington D.C. burning it in the Capitol," and videoed himself smoking the marijuana joint.



Clifton exited the building through a window less than five minutes after police officers corralled him out of the Visitor's Lobby and out of the building. As Clifton jumped out of the window, he proudly exclaimed, "we just climbed through the fucking window!"

In total, Clifton spent about 30 minutes inside the Capitol. Clifton texted a family member shortly after he and Johnston left the Capitol and said, "I did go inside and I did get a lot of the action that was going on." He also explained that, while he "didn't do any of the stupid shit breaking [he] did go inside and [] did get a lot of video of the action that was going on."

*Chad Clifton's Post-January 6 Statements*

After January 6, 2021, Clifton's conduct and rhetoric were anything but remorseful. Clifton expressed anger and aggression in his text messages. For example, two days after breaching the Capitol building, Clifton sent a text message to Johnston with regard to January 6, stating that "this shit ain't over" and threatening that "these motherfuckers are going to die this weekend" and exclaiming that there "will be a day of reckoning":

> I'm telling you man I'm fucking telling you this shit ain't over and these motherfuckers are going to die this weekend. He is going to sickness strongest snipers the strongest military forces out and only patrol for these people. We are running out of time and it is time to take action in the fullest a force needed to complete this mission! I believe in my president and what he's doing this is all a game of chess and who has the strategy? We can see he does! It will be a day of reckoning when John John shows up and does the tail all! We may not be out of the woods but we are trimming trees!

Clifton also discussed his hope that former President Trump would enact a legal loophole in order to remain president. Clifton exclaimed that he was "ready to fight to the last ducking drop of my blood or my breath" because he was "not giving up this fucking country." In his violent rhetoric, Clifton stated that he had been "collecting guns in armory and artillery for a long fucking time," and he made a generic but aggressive threat of "I beg the wrong motherfucker to act up right now."

13

The day after January 6, Johnston sent messages to Clifton expressing fear that the government would use facial recognition technology to "try and make trouble for people," and worried that "Dems might be looking for revenge." Clifton responded that they would "definitely" find trouble.

In February 2021, Clifton and Johnston discussed strategy to deal with any impending charges from their conduct on January 6, including not telling investigators anything about their conduct January 6 unless they were offered immunity from prosecution. After learning that the FBI had been investigating them, Clifton and Johnston remained concerned about their impending arrests. For example, Clifton had sent an aggressive text message hoping he could get the investigating special agent "to fuck off."

Then, on the day of Clifton's and Johnston's arrests, Clifton sent Johnston a warning text that said, "I just wanted to let you know it's happening!"

Clifton's violent rhetoric before and after January 6 is a highly aggravating feature of this offense.

*Chad Clifton's Interview*

As a condition of his plea agreement, Clifton met for an interview with the FBI. During that interview, Clifton accepted responsibility for what he had done. He claimed that he went to Washington, D.C. to support his President and that he merely did "what was asked of him" by going to the Capitol. Clifton considers his participation on January 6 to be a mistake because of the trouble it has caused him and his co-defendant. He acknowledged the violence that occurred on January 6. At the interview, Clifton appeared to be forthcoming about his conduct and accept responsibility for his actions. He voluntarily provided to the FBI pictures and videos that he had taken on January 6, 2021.

*The Charges and Plea Agreement*

On May 23, 2022, the United States charged Clifton by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). On October 13, 2022, pursuant to a plea agreement, Clifton pled guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Clifton agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Clifton now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Clifton faces up to six months of imprisonment and a fine of up to $5,000. Clifton must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days incarceration, 36 months of probation, and $500 in restitution.

### A.  The Nature And Circumstances Of The Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States*

*v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). Had Clifton personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Clifton's part is therefore not a mitigating factor in misdemeanor cases.

Before entering the Capitol on January 6, Clifton was nearly at the very front of a massive crowd of rioters, where he bore witness to violent interactions between law enforcement and rioters and heard loud warning signs to leave. Instead, he bragged about breaking "past the barrier" after "the policemen ha[d] been overwhelmed." Clifton entered the building when it was rife with commotion from the recent breach, despite a fellow rioter warning that police officers could use lethal force against the rioters for entering. Throughout his thirty minutes in the Capitol Building, Clifton witnessed numerous things that would have led any law abiding person to know he should leave, but he never chose to do so.

Perhaps most troubling are the statements that Clifton made before and after January 6, 2021, where, in the context of Trump's re-election, Clifton promised death on anyone who came between him and his president. After January 6, rather than accept responsibility or express remorse of any kind, Clifton responded with anger and aggression. He made numerous references to violence, and resoundingly contended that he was "ready to fight to [his] last fucking drop of my blood or my breath." He referenced his collection of an armory and artillery and exclaimed that he was "ready to site."

Accordingly, the nature and the circumstances of this offense reflect a need for a period of incarceration and probation.

### B.  The History And Characteristics Of Clifton

As set forth in the PSR, Clifton's history and characteristics show that he had several stability factors present in his life at the time of his offense, such as a history of employment and no criminal history. ECF No. 34, ¶¶ 26-31, 47-52. Clifton has been self-employed since 2014 as a contractor.

With one exception reported on November 9, 2022, ECF No. 35, where Clifton failed a drug test, he has been compliant with his conditions of pre-trial release. He appears to have taken responsibility for his actions by pleading guilty, which demonstrates an acceptance of responsibility, but he has yet to express sincere remorse for his criminal conduct.

### C.  The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense And Promote Respect For The Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.

### D.  The Need For The Sentence To Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  The court should also consider specific deterrence. Clifton's conduct on January 6, 2021, and his statements prior to and following the attack on the Capitol, as detailed above, demonstrate a strong need for specific deterrence.

### E.  The Need To Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol. Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.[2]

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than

---

[2] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses), like here, are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records.

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Johnston*, 21-cr-182 (BAH), this Court sentenced Clifton's co-defendant to 21 days of incarceration as a condition of 36 months of probation, 90 days of home detention, a $2,500 fine, and $500 in restitution. Johnston followed the same path as Clifton throughout the Capitol building, witnessed the same violent confrontations between rioters and police officers, and displayed the same recalcitrant behavior on January 6. On January 6, Johnston was a practicing attorney, which was a particularly aggravating factor because an attorney of law should have known better than to engage in an obviously unlawful attack on the United States Capitol building. Although Clifton is not an attorney, his violent and threatening rhetoric before, during, and after January 6 presents an additional aggravating factor not present in Johnston's case. Additionally, Clifton smoked marijuana inside the Capitol building, demonstrating the utmost disrespect for the building and his country. These additional aggravating factors warrant a comparable sentence to that imposed on Johnston.

In *United States v. Sorvisto*, 21-cr-320 (ABJ), another Section 5104(e)(2)(G) case, the defendant made his way through tear gas and unruly crowds on the West side of the Capitol to enter the building less than 15 minutes after the initial breach and only a few minutes after Clifton had entered through the same conditions. Like Clifton, when Sorvisto entered the Capitol building, he would have likely seen broken glass and heard alarms as he went through the Senate Wing doors. Once inside, Sorvisto made a similar trek as Clifton, heading toward the Crypt where rioters outnumbered and eventually overran a line of police officers. Sorvisto entered the Crypt Lobby near Clifton and Johnston, where rioters prevented the sliding bay doors from closing and walked through those doors to the Visitor's Lobby.  Similar to Clifton, Sorvisto left when police officers corralled them out, and he exited the Capitol building through the same window as Clifton. Sorvisto remained inside the Capitol Building for approximately 25 minutes, about five minutes

less than Clifton. Sorvisto had similar (but less) violent rhetoric to Clifton – he bragged in a text message about "tak[ing] this country back" and he instructed his friend to "delete them dc pics" on January 7. However, unlike Clifton, there was no evidence that Sorvisto witnessed (and recorded) the violence between rioters and law enforcement on the West front prior to entering the Capitol, bragged about breaking past the barriers and overwhelming police officers, heard the LRAD warnings, or took a hit of marijuana in the building. Judge Berman Jackson sentenced Sorvisto to 30 days' imprisonment and no term of probation.

Finally, in *United States v. Lavin*, 21-cr-596 (BAH), the defendant, like Clifton, spent approximately 30 minutes inside the Capitol building. Once inside the building, Lavin and Clifton followed approximately the same route throughout the Capitol building. They both entered the building within minutes of each other through the Senate Wing Door and proceeded to the Crypt, where they joined a large group of rioters that confronted U.S. Capitol Police Officers who had formed a line blocking rioters from advancing farther into the building. The group of rioters quickly outnumbered the officers and were able to push past them. Lavin, like Clifton, also went through the Crypt Lobby where rioters prevented rolling bay doors from closing, and into the Visitor's Center. Once in the Visitor's Center, Lavin (and Clifton) recorded or took pictures of a confrontation between police officers and rioters. Lavin sent pictures to friends from January 6, but they were not accompanied by the same rhetoric and rabid threats of violence as Clifton's messages and posts. This Court sentenced Lavin to 10 days incarceration and 36 months of probation. Clifton has a greater number and more significant aggravating factors than Lavin, such as his postings on social media and rhetoric about the day, clear warning signs before entering the building such as the LRAD system and the violent encounters on the West front, and smoking marijuana in the Capitol building.

Again, while Clifton's conduct is not identical to any of the above-mentioned defendants, the combination of factors suggest that a sentence of 21 days of imprisonment followed by probation would be sufficient to avoid unwarranted sentencing disparities with other defendants who were similarly situated.

## V.     A Sentence Of Probation May Include Imprisonment As A Condition Of Probation

A sentencing court may impose imprisonment as a condition of probation under 18 U.S.C. § 3563(b)(10). Under Section 3563(b)(10), the Court may impose an imprisonment term in distinct intervals, with each interval not exceeding two weeks. In this case, a sentence of 21 days of imprisonment and 36 months of probation is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2). The Court may impose such a sentence either under Section 3563(b)(10), with a term of imprisonment as a condition of probation, or as a split sentence under Section 3561(a)(3).

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release. 18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[3]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation. 18 U.S.C. § 3653(b)(10). Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation. *Id.* Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation. *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10). Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (finding continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits.").

---

[3] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation). Imposing an intermittent confinement sentence with 21 days of imprisonment as a condition of probation is appropriate in this case.

## VI.   A Sentence Imposed For A Petty Offense May Include Both Imprisonment And Probation

The government's recommended sentence of 21 days of imprisonment as part of a 36 month term of probation is also permissible under 18 U.S.C. § 3561(a)(3). As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses." *Little*, 590 F. Supp. 3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).[4] Because the government has previously briefed a sentencing court's authority to impose a split sentence for a

---

[4] Several judges of this District have imposed a split sentence on a defendant convicted of a single petty offense. *See, e.g.*, *United States v. Sarko*, No. 21-cr-591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21-cr-342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ([T]he Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case.").

defendant convicted of a single petty offense in multiple cases before this Court, it will not repeat those arguments here.[5]

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Clifton to 21 days incarceration, to be served intermittently in installments, as a condition of and within the first 12 months of a 36 month term of probation, pursuant to 18 U.S.C. § 3562(b)(10), and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    *s/ Ashley Akers*
Trial Attorney
MO Bar No. 69601
Detailed to the U.S. Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 353-0521
Ashley.Akers@usdoj.gov

---

[5] The defendant's appeal of the split sentence imposed in *Little* is pending. The D.C. Circuit heard oral argument on November 2, 2022.